Filed 6/29/15  second modification

# CERTIFIED FOR PARTIAL PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HELEN CHUNG,<br><br>    Defendant and Appellant. | B253580<br><br> (Los Angeles County<br> Super. Ct. No. BA408648)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING<br><br><br>[CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 4, 2015, be modified as follows:

1.  The last paragraph of the opinion, under the heading "Disposition," should be deleted in its entirety, and replaced with the following language: The judgment is reversed insofar as it imposes and executes consecutive sentences on counts five and six. The case is remanded to the trial court for resentencing.  The judgment is otherwise affirmed.


The court has received and considered Respondent's Petition for Rehearing and Appellant's Answer.  The Petition is DENIED.

_____
EPSTEIN, P. J.                          MANELLA, J.                          COLLINS, J.

Filed 6/9/15  Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B253580 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA408648) |
| v. | |
| HELEN CHUNG, | MODIFICATION |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 4, 2015, be modified as follows:

The Introduction section on page 2 is to be included for publication.

There is no change in the judgment.

_____

EPSTEIN, P. J.                    MANELLA, J.                    COLLINS, J.

Filed 6/4/15  Unmodified opinion

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>HELEN CHUNG,<br><br>  Defendant and Appellant. | B253580<br><br>(Los Angeles County<br>Super. Ct. No. BA408648) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Rand Rubin, Judge.  Affirmed in part, reversed in part and remanded in part.

Davina T. Chen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, only the Factual and Procedural History, parts D., D. 1 and 2 of the Discussion, and the Disposition are certified for publication.

**INTRODUCTION**

Defendant Helen Chung appeals from her conviction by jury on three counts of offering narcotics for sale, with special allegations regarding prior narcotics convictions. She was sentenced to a total term of 16 years and four months and was ordered to pay various fines and fees. Chung raises a number of contentions on appeal: first, that the prosecutor improperly struck the only African-American prospective juror from the panel during voir dire; second, that evidence of her prior convictions was improperly admitted at trial; third, that one of the police officer witnesses gave improper and unqualified expert testimony; and fourth, that the consecutive sentences she received violated the bar on multiple punishment for a single act under Penal Code section 654.[1] We reverse the judgment with respect to the consecutive sentences imposed on counts five (offer to sell methamphetamine) and six (offer to sell cocaine) and remand to the trial court for proceedings consistent with this opinion. We affirm the judgment in all other respects.

**FACTUAL AND PROCEDURAL HISTORY**

*A. Procedural Background*

An information charged Chung (aka Thuy Pham) with the following six counts: possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 1), possession of cocaine base for sale (Health & Saf. Code, § 11351.5; count 2), possession of cocaine for sale (Health & Saf. Code, § 11351; count 3), offer to sell cocaine base (Health & Saf. Code, § 11352; count 4), offer to sell methamphetamine (Health & Saf. Code, § 11379; count 5), and offer to sell cocaine (Health & Saf. Code, § 11352; count 6). The information further alleged that Chung had suffered five prior felony narcotics convictions and had served five prior prison terms (Health & Saf. Code, § 11370.2; Pen. Code § 667.5, subd. (b)).

---

[1]   All further statutory references herein are to the Penal Code unless otherwise indicated.

2

Chung pleaded not guilty and denied the special allegations. Following trial, the jury found Chung not guilty on the possession counts (counts one through three), but guilty on the offer to sell counts (counts four through six). Chung waived jury trial on, and then admitted, the five prior conviction allegations.

On November 13, 2013, the court sentenced Chung to a total term of 16 years and four months. On count four, the court imposed the upper term of five years, plus nine years for three prior felony convictions.[2] (Health & Saf. Code, § 11370.2, subd. (a)). The court imposed one-third of the middle term for count five (equaling one year) and count six (equaling one year and four months), both sentences to run consecutively to count four. Chung timely appealed.

B. Evidence at Trial

1. Narcotics Sale

On the afternoon of March 5, 2013, Los Angeles Police Department (LAPD) Officers Hiroshi Uehara and Phillip Chan were conducting surveillance of Sergio Moran, who they believed was involved in narcotics trafficking. They observed Moran drive a gray Chevrolet Suburban south on Bixel Street in Los Angeles, pass Fourth Street, and then park behind a black Dodge Charger. Within seconds, Chung exited the Charger from the front passenger seat and entered the front passenger seat of the Suburban. Moran and Chung remained in the Suburban for "maybe a minute or two," then Chung exited the vehicle and re-entered the front passenger seat of the Charger. Moran followed "shortly thereafter" and entered the rear passenger seat of the Charger, directly behind Chung. The officers testified that they were looking at Chung's and Moran's hands and

_____

[2]     The court struck the remaining prior conviction enhancements in the interest of justice.

3

clothing as they walked between the vehicles and did not observe them carrying anything. [3]

Once Moran entered the Charger, the officers decided to approach the vehicle. Officer Uehara approached the passenger side of the Charger and saw Moran holding and examining a "large off-white, crystal-like substance" in his hand, which proved to contain methamphetamine. When Moran noticed the officers, he threw the methamphetamine onto the floor. Officer Uehara then took Moran into custody, while Officer Chan removed Chung and the driver of the Charger, Angela Suh, from the front seats and took them into custody.

In addition to the methamphetamine Moran dropped on the floor of the Charger, the officers recovered a large, gallon-size Ziploc bag from the back seat of the vehicle. That Ziploc bag held four smaller plastic baggies—one containing powder cocaine, two containing methamphetamine, and one containing cocaine base. There also was a folding scale of the type commonly used to measure narcotics on the back seat. The scale was working, open and ready for use. The officers also recovered a purse containing Chung's identification and $870 in a variety of denominations from the floor of the front passenger seat, and a purse containing Suh's identification, two baggies of methamphetamine, and $20 in cash from the driver's seat. The officers found nothing in the Charger that could be used to ingest the narcotics and neither Suh, Moran, nor Chung appeared to be under the influence of narcotics when arrested. The officers searched Moran and recovered $2,317, in a variety of denominations, and a baggie of heroin between his buttocks.

The LAPD analyzed the recovered narcotics and found that the methamphetamine dropped by Moran weighed 21.8 grams, the baggie of cocaine in the back seat weighed 44.8 grams, the baggie of cocaine base in the back seat weighed 2.86 grams, the baggie of

---

[3]     The officers were parked on the same side of Bixel Street, just north of Fourth Street. Officer Uehara estimated they were "a hundred feet or longer" from the other vehicles, but were using binoculars to observe the suspects.

4

heroin found on Moran weighed 5.97 grams, and the methamphetamine found in Suh's purse weighed 31.6 grams.

## 2. Expert Testimony

Officers Uehara and Chan testified as both percipient witnesses and narcotics experts. Officer Uehara testified that he had been a police officer for almost 11 years and assigned to narcotics enforcement for over three years. He received 40 hours of narcotics training in the academy and attended a five-day, 40-hour narcotics school, both of which included instruction as to the "identification, manufacturing, distribution, and types of usage" of all three drugs recovered here. His work in the narcotics unit "deals extensively with narcotics on a daily basis – surveillance, identification, interviewing arrestees, users, buyers of narcotics." He had posed undercover as a street dealer and a buyer, authored search warrants related to narcotics, and "talked to more experienced detectives and officers."

Officer Uehara testified that in his experience, the large amount of cash in various denominations carried by Chung and Moran suggested they were involved in a narcotics transaction, because buyers and sellers carry that type of cash to make change and to buy and sell the product. He testified that he saw drug transactions occurring inside a vehicle "all the time," but had never seen an instance where a seller brought all the drugs to the buyer's vehicle. This was an unlikely scenario because "the dealer wants to minimize risk, risk of being caught, risk of being robbed." Instead, typically, the buyer enters the seller's vehicle and exchanges money for the narcotics.

When the prosecution posed a hypothetical based on the facts of the case, Officer Uehara opined that the front female passenger (in Chung's position) possessed the narcotics for sale. He based his opinion on the large amount and different types of narcotics found, the large amount of money seized, the lack of any smoking paraphernalia at the scene, and the absence of signs of narcotic use by the suspects. He also opined that the "lack of small individual baggies . . . suggests to me that this is a mid-level size dealer as opposed to a street dealer."

5

Officer Chan testified that he had been a police officer for 20 years and on narcotics assignment for 11 years. He opined that the evidence in the case was consistent with a mid-level sale, as opposed to a street-level sale, based on the amounts of narcotics and money involved and the use of the scale. He testified that, in his experience, a seller would not take his drugs into a buyer's vehicle. Both officers acknowledged that it would be unusual for Chung, as a seller, to initiate contact by going into Moran's vehicle, even without any narcotics.

## DISCUSSION

[Parts A through C are deleted from publication. See post at page 20 where publication is to resume.]

*A. Jury Selection*

Chung contends the trial court erred in concluding that the prosecution's exercise of a peremptory challenge to an African-American prospective juror was nondiscriminatory and thereby rejecting her motion pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). We disagree.

### 1. Legal Principles

A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of race violates the defendant's rights to a representative jury under article I, section 16 of the California Constitution and to equal protection under the Fourteenth Amendment of the United States Constitution. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 101.) "'In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has

6

proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 (*Johnson*).)'" (*Ibid.*, quoting *People v. Clark* (2011) 52 Cal.4th 856, 904.)

   2. *Underlying Proceedings*

During voir dire, prospective juror G-4527 was called to sit in seat 16 after the prosecutor had exercised four peremptory challenges. The parties agree (and the record contains no evidence to dispute) that juror G-4527 was the only African-American member of the venire. He stated that he lived in West L.A., was single with no children and had no prior jury experience. He had worked as a graphic and web designer but was currently unemployed. He also related two experiences with the police: his uncle was a police officer in Belize and his stepfather had once called the police and spent the night in jail after an argument with the juror's mother.

During questioning by defense counsel, juror G-4527 stated his uncle did not come to the United States often, the uncle had no friends in the LAPD, and that his relationship with his uncle did not make him more or less favorable toward police. He also said that he felt the police had treated his stepfather fairly and he was not upset at the police because of that incident. In the next round of questioning by the prosecutor, juror G-4527 stated that he had last worked a year and a half earlier doing graphic and web design on a contract basis for a small coffee shop. He held that position for about a year. Prior to that, he had taken some general education courses, "just testing out the waters," at West Los Angeles College, but had not graduated.

During the following round of challenges, juror G-4527 was moved to seat seven. The prosecutor then exercised his next peremptory challenge to strike him. Defense counsel objected on *Wheeler* grounds, stating that the juror "was the only African American individual on the entire panel and there's nothing in his answer that indicated a bias. [¶] He could not have been challenged for cause -- he would not have been challenged for cause and I don't see -- I don't see the frame for the challenge being exercised."

The court found that defense counsel had failed to establish a prima facie case, stating that "I don't see at this point that there is anything indicating on the record that the people

7

have excused this juror due to a discriminatory purpose." Nevertheless, the court asked the prosecutor whether he wanted "to put anything on the record." The prosecutor then gave the following reasons for striking the juror: "First and foremost, his demeanor in answering the questions was very curt and very short. He did not appear to be a juror that was going to be working with others. He appeared young in appearance. [¶] He did not graduate from his schooling so the -- in this case the expert opinion by the officer is something that he may or may not be able to completely comprehend. [¶] And he works in a position as a graphic web designer. He has not held a job for a particularly long period of time which is of concern for purposes of stability and life experience which he does not and would not have. [¶] Considering that for a year and a half he's been unemployed and he worked for a year prior to that and then prior to that he was in West L.A. school that he did not finish. [¶] I would also note that . . . the bottom of . . . at least [one of his pant] legs w[as] significantly ripped which for me shows overall lack of respect for the judicial process and system."

The court then stated it did not "find a strong likelihood that the juror was struck due to a group association, so the *Wheeler* motion is respectfully denied."

### 3. The Trial Court Found No Prima Facie Case

Although Chung concedes that the trial court "initially found no prima facie case," she claims the court nevertheless proceeded to the second and third steps of a *Wheeler/Batson* analysis, and therefore "the first step is moot." To the contrary, when a trial court "states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied. [Citations.]" (*People v. Howard* (2008) 42 Cal.4th 1000, 1018 (*Howard*); see also *People v. Bonilla* (2007) 41 Cal.4th 313, 343, fn. 13 (*Bonilla*) ["[I]t is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out. This may assist the trial court in evaluating the

8

challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established."].)

In contrast to the record here, the cases cited by Chung are characterized as "'first stage/third stage *Batson* hybrid'" cases, in which the prima facie showing became moot because the court reached the third stage. (*People v. Riccardi* (2012) 54 Cal.4th 758, 786 [prosecutor gave his reasons for peremptory strikes before the court made any finding regarding a prima facie case]; *People v. Mills* (2010) 48 Cal.4th 158, 174 [third stage where court expressly noted it was "'satisfied . . . from the explanation given by the prosecutor' that the motivation for the challenges was not based on race"].)

Chung argues that the trial court's use of the phrase "strong likelihood" in denying the motion suggests a third-step analysis. We do not agree. Indeed, the original test for the first step under *Wheeler* required a defendant to establish a "strong likelihood" that a juror was peremptorily challenged on the basis of group bias. (*Wheeler*, *supra*, 22 Cal.3d at p. 280.) The Supreme Court later disapproved that standard for purposes of establishing a prima facie case, replacing it with the current test. (*Johnson, supra,* 545 U.S. at pp. 166-168.)[4] Moreover, the court here made no factual findings as to any of the reasons offered by the prosecutor, which supports the conclusion that the court did not intend to engage in a third-step analysis.

>    *4. Chung Failed to Make a Prima Facie Showing*

When, as here, a trial court finds a defendant has failed to make a prima facie showing giving rise to an inference of discriminatory purpose, we "undertake an independent review of the record to decide 'the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race.' [Citation.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 614.) We sustain the finding of the trial court if we conclude the totality of the relevant facts does not give rise to an inference of

---

4      Whether the trial court applied the correct standard under *Johnson* is immaterial, as we review the record independently.

9

discriminatory purpose.  (*Howard, supra,* 42 Cal.4th at p. 1018.)  We presume that "a prosecutor uses his peremptory challenges in a constitutional manner.  [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 193.)  The defendant "should make as complete a record of the circumstances as is feasible."  (*Wheeler*, *supra*, 22 Cal.3d at p. 280.)

Here, Chung's showing was minimal.[5]  In arguing the *Wheeler* motion, defense counsel merely stated that juror G-4527 was the only African-American individual in the venire and that he had given no answers that would support a challenge for cause.  That the prosecutor excused a single African-American prospective juror, without more, does not support the inference the exclusion was based on race.  (*People v. Taylor, supra,* 48 Cal.4th at p. 614; see also *People v. Bell* (2007) 40 Cal.4th 582, 598 [While "'the exclusion of a single prospective juror may be the product of an improper group bias . . . , the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion.'"].)  Thus, the California Supreme Court has held that the exclusion of most or all members of an identifiable group when there are only a few members of that group in the jury pool, without more, does not support an inference of discriminatory purpose. (See *People v. Bell, supra,* 40 Cal.4th at p. 598 [excusing two of three African Americans insufficient for prima facie case, stating "the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible"]; see also *Bonilla*, *supra*, 41 Cal.4th at pp. 342–343 [excusing the only two African Americans out of a 78-person juror pool insufficient for prima facie case].)

Nor does our review of the record disclose any other facts that would support an inference that the prosecutor impermissibly excused juror G-4527 based on his race.  Because juror G-4527 was the only African-American in the pool, this is not an instance where there were numerous African-Americans in the venire and the prosecutor "struck

---

[5]  Notably, Chung's counsel on appeal does not seek to demonstrate that Chung satisfied her prima facie burden below, but instead asserts that the first step is moot.

most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group." (*People v. Kelly* (2007) 42 Cal.4th 763, 779.) It may also be significant if the prosecutor failed to engage the excused juror "in more than desultory voir dire." (*Ibid*.) But the prosecutor questioned juror G-4527 about his work and educational history. Finally, no other aspect of the prosecutor's questioning during voir dire suggested any discriminatory purpose. Indeed, the reasons given by the prosecutor in response to Chung's motion reveal several grounds on which the prosecutor reasonably could have challenged juror G-4527, including his instability and inexperience, as evidenced by his youth, his lack of jury experience, and his failure to hold long-term employment or finish schooling.[6] The extent of this inquiry was comparable in length and depth to that of other jurors. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 723-724 [even where no prima facie case found, court may properly consider reasons actually given by the prosecutor]; *People v. Sims* (1993) 5 Cal.4th 405, 430 [youth and lack of experience are race-neutral reasons].)

We decline Chung's invitation to engage in comparative juror analysis on appeal. Apart from the inherent limitations of such analysis on a cold appellate record, "this is a 'first-stage' *Wheeler/Batson* case, in that the trial court denied defendant's motions after

---

[6] As such, even if we proceeded to the second and third steps of the *Wheeler/Batson* analysis, we would affirm the trial court's denial of Chung's motion. We note, in particular, that we do not find compelling Chung's comparison of the instant case to the facts presented in *Snyder v. Louisiana* (2008) 552 U.S. 472 (*Snyder*). In *Snyder*, the prosecutor offered two race-neutral reasons for striking an African-American prospective juror—that he "looked very nervous to me" and that he was a student teacher who would have to miss class. (*Id*. at pp. 478-479.) The Supreme Court found the second reason implausible because the trial court had spoken to the dean of the juror's school and alleviated the conflict, in contrast to several white jurors (accepted by the prosecution) who had obligations that seemed "substantially more pressing." (*Id*. at pp. 483-484.) As a result, in undertaking the third step of the *Batson* inquiry, the Court held that "[t]he prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent." (*Id*. at pp. 484-485 [citing *Miller-El v. Dretke* (2005) 545 U.S. 231, 252].) Here, while several of the prosecutor's proffered reasons may not have been particularly strong, they were far stronger than the blatantly pretextual explanation in *Snyder* and did not give rise to the same discriminatory inference.

11

concluding she had failed to make out a prima facie case. It is not a 'third-stage' case, in which a trial court concludes a prima facie case has been made, solicits an explanation of the peremptory challenges from the prosecutor, and only then determines whether defendant has carried his burden of demonstrating group bias." (*Howard*, *supra*, 42 Cal.4th at p. 1019 (citing *Bonilla, supra,* 41 Cal.4th at p. 313).) Comparative juror analysis is not mandated in such circumstances. (*Bonilla*, *supra*, 41 Cal.4th at p. 350.) Accordingly, we conclude that Chung failed to meet her burden to establish a prima facie case of discriminatory use of a peremptory challenge by the prosecution.

## B. *Admission of Prior Convictions to Prove Intent*

Chung contends that the court erred in admitting evidence of three of her prior narcotics convictions. The prosecutor sought to admit the convictions pursuant to Evidence Code section 1101, subdivision (b), as evidence of Chung's intent to sell, but she claims they were used as improper character evidence. We disagree and affirm.

### 1. *Legal Principles*

It is a long-standing rule that evidence of a defendant's character, including prior crimes other than those charged, is inadmissible to prove defendant's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) However, Evidence Code section 1101, subdivision (b), permits evidence of a defendant's past criminal acts when relevant to prove a material fact at issue, such as intent. (*Ibid.*) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.]" (*Ewoldt, supra,* 7 Cal.4th at p. 402.) "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Ibid.*) We review a trial court's rulings on the admissibility of evidence, including evidence of uncharged offenses, for an abuse of discretion. (*People v. Walker* (2006) 139 Cal.App.4th 782, 794-795.) Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its

discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)  "'The admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair.'  [Citations.]"  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

        2.  *Underlying Proceedings*

On September 6, 2013, the trial court held a hearing on Chung's motion to exclude evidence of her prior narcotics convictions and the prosecution's motion to admit four of those prior convictions under Evidence Code section 1101, subdivision (b).  The three prior convictions ultimately admitted had the following circumstances:

Case Number GA060697:  On March 4, 2005, at approximately 5:56 a.m., police officers responded to a report regarding a stolen vehicle.  They found Chung sitting in the front passenger seat of the vehicle with her eyes closed and mouth open.  The officers knocked on the window and woke Chung.  They discovered she was on probation, searched her purse, and found two plastic baggies containing 30.5 grams of methamphetamine, two pieces of paper containing nine grams of methamphetamine, $50 in cash, and 5 pages of pay and owe information.  Chung was convicted of possession of methamphetamine for sale.

Case Number BA315473:  On January 12, 2007, at approximately 5:30 p.m., police officers ran a license plate check on a car Chung was driving and discovered it had been reported stolen. The officers stopped the vehicle and found Chung in the driver's seat and a passenger in the front passenger seat.  The officers conducted a parole search of Chung and found eight plastic baggies containing 34.13 grams of methamphetamine in her brassiere and $326 in various denominations in her purse. Chung was convicted of possession of methamphetamine for sale.

Case Number BA338699:  On April 3, 2008, at approximately 10:30 p.m., police officers ran a license plate check and discovered Chung was driving a stolen car.  Officers searched Chung and the car and found plastic baggies containing methamphetamine

13

between her buttocks and in her pants pocket, a plastic baggie containing multiple empty baggies in her pants pocket, a black digital scale in her purse, and $353 in various denominations in the driver's side door. Chung was convicted of possession of methamphetamine for sale.

Defense counsel argued at the hearing on the motions that the prior incidents were not sufficiently similar to the current offense to be admissible under Evidence Code section 1101, subdivision (b), and that, even if admissible, they were more prejudicial than probative and should be excluded pursuant to Evidence Code section 352.

The court found that the prior convictions were relevant, as the three convictions detailed above were "substantially similar" and had a "tendency to prove the intent." The court further concluded that the evidence was admissible under Evidence Code section 352, as it was not inflammatory, confusing, remote, or time-consuming. The court noted that the undue prejudice at which the statute was aimed was "evidence that uniquely tends to invoke an emotional bias against the defendant as an individual and which has very little effect on the issues." Applying that standard, the court found no undue prejudice, but admitted only the three prior convictions that involved Chung "being in a vehicle with methamphetamine and money and . . . one of them with a scale."

### 3. No Error in Admitting Prior Convictions

Chung argues that the trial court erred in finding her three prior convictions were sufficiently similar to the charged offense here to be admissible as probative of her intent to sell to Moran. She claims that the presence of cash and a digital scale are "features of garden variety drug sales" and otherwise, "the only similarity" is that all of the offenses "involved drugs." While there are certainly differences between the prior convictions and the instant case, the standard does not require the uncharged conduct to be identical, but rather merely "sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent [to sell] in each instance." [Citations.]'" (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) Here, all of the convictions involved Chung's alleged possession of large amounts of methamphetamine contained in plastic baggies and cash

14

in various denominations, and one of the prior cases also involved the use of a digital scale.[7] As the police officer experts testified at trial, these precise elements, among others, were highly probative of Chung's intent to sell the narcotics, rather than possessing them for personal use. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 607 ["[i]n prosecutions for drug offenses, evidence of prior drug use and prior drug convictions is generally admissible under Evidence Code section 1101, subdivision (b), to establish that the drugs were possessed for sale rather than for personal use…."]; *People v. Pijal* (1973) 33 Cal.App.3d 682, 691.) As such, it was not an abuse of discretion for the trial court to find that Chung's prior convictions were probative of her intent to sell in this case.

Chung also contends that the prior convictions should not have been admitted because the act of possession was in dispute here and because she had conceded the fact of intent. Neither contention has merit. First, Chung is correct that where prior uncharged acts are admissible to prove intent, they cannot also serve to prove the underlying act—that must be independently established or conceded. (See, e.g., *Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2.) But Chung cites no authority for her argument that because the jury ultimately acquitted Chung of possession (the underlying act), the evidence of prior convictions should not have been admitted as tending to prove intent. Rather, the jury was free to either convict Chung of possession based on other evidence, in which case the prior convictions would be relevant to prove Chung possessed the narcotics with the intent to sell, or to acquit her of possession, which it did. Moreover, the trial court instructed the jury on the limited purposes for which the evidence of the prior offenses could be used. We presume the jury understood and followed those instructions. (See *People v. Danielson* (1992) 3 Cal.4th 691, 722, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

---

[7] We agree with Chung, however, that the use of a car in the prior instances is not probative. There is no evidence that Chung was using the car as the site of the narcotics sales transactions in any of the prior cases.

15

Second, Chung points to statements her counsel made that suggested he would concede that whoever "possessed the drugs intended to sell them" and would not assert a personal use defense for Chung. But such suggestions that *someone* must have possessed the narcotics with the intent to sell them did not remove the prosecutor's burden to prove *Chung* harbored that intent, and thus did not render the prior convictions immaterial. Chung further contends that the court should have excluded her prior convictions, even if they were somewhat relevant, as more prejudicial than probative under Evidence Code section 352. The trial court expressly found that three of the prior convictions were probative of Chung's intent, as discussed above, and that they were not confusing, remote, time-consuming, or otherwise so unduly prejudicial so as to "invoke an emotional bias against the defendant as an individual," as required for an exclusion under Evidence Code section 352. It was not an abuse of discretion for the court to reach this conclusion. The cases Chung cites involve acts of sexual misconduct where the commission of the act itself provided sufficient evidence of the requisite intent; these cases have no application here. (See *Ewoldt, supra*, 7 Cal.4th at p. 406 [prior acts inadmissible to prove intent because "[i]f defendant engaged in this conduct [fondling the victim] his intent in doing so could not be reasonably disputed"]; *People v. Balcom* (1994) 7 Cal.4th 414, 422-423 ["[n]o reasonable juror" could find defendant committed charged act of rape while holding gun to victim's head "but lacked the criminal intent" required].)

Moreover, we find no reasonable likelihood the "jury's passions were inflamed by the evidence of [the] uncharged offenses." (*Ewoldt*, supra, 7 Cal.4th at p. 405.) As Chung suggests, the danger in admitting this prior act evidence is that the jury will improperly infer that the defendant has a criminal disposition. However, in this case, the jury acquitted Chung of all three counts of possession for sale, demonstrating it did not accept the evidence of her prior convictions uncritically or use it improperly to prove her propensity to commit all of the offenses charged here.

    *4. Any Error Was Harmless*

Finally, even if the court committed an error by admitting any of Chung's prior convictions, such error was harmless. We evaluate error in the admission of prior crimes evidence using the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), under which we determine whether it was "reasonably probable that a result more favorable to defendant would have resulted" had the prior crimes evidence not been admitted. (*People v. Welch* (1999) 20 Cal.4th 701, 750.)

Chung argues that there was no evidence she offered to sell any of the drugs, apart from the inference raised by her prior convictions. To the contrary, the evidence established that immediately after Moran parked, Chung entered his vehicle, remained there briefly, and then returned with Moran to her vehicle. The police officers observed no drugs or related items carried between the vehicles and found none in Moran's car. They then recovered large quantities of narcotics ("the Costco of all drugs," as coined by defense counsel) from the Charger, along with a scale, and large amounts of cash in various denominations from both Moran and Chung. Based on these facts, it is not reasonably probable that the jury would have acquitted Chung of offering to sell narcotics absent the evidence of her prior convictions for possession with intent to sell.

*C. LAPD Expert Testimony*

Chung claims the trial court erred in allowing Officer Uehara to offer an expert opinion based on a hypothetical that mirrored the facts charged here, both because he was not properly qualified to offer such expert testimony and because his opinion was not supported by the facts at trial. We find no error and affirm.

As an initial matter, we find that Chung forfeited this argument by failing to raise it at trial. "We have long and repeatedly held that a defendant who fails at trial to object that a witness lacks the qualifications to render an expert opinion may not on appeal contest the opinion's admissibility." (*People v. Dowl* (2013) 57 Cal.4th 1079, 1087; see also *People v. Farnam* (2002) 28 Cal.4th 107, 162 [defendant forfeited claim that expert was not qualified to testify on one topic where his objection was to expert's qualification on a different topic].) Chung concedes that she did not object to Officer Uehara's general

17

qualifications as a narcotics expert, but claims she did raise an objection to his testimony regarding mid-level sales, specifically his response to the hypothetical posed by the prosecution matching the facts of the charged offense. When the prosecutor asked Officer Uehara, based on the hypothetical, "whether or not the front passenger female possessed those items for sale," defense counsel objected that the question "lacks foundation. That's for the jury to decide." The court overruled the objection. Thus, defense counsel's objection focused on the alleged impropriety of the hypothetical. Chung raised no objection at any time to Officer Uehara's qualifications to testify as an expert, either generally or specifically as to mid-level sales, which is the basis for her argument on appeal. She has therefore forfeited the right to raise it now.

In any event, even if we reached the merits of Chung's argument, we would conclude that the trial court did not abuse its discretion in admitting Officer Uehara's testimony. "The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court. [Citations.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175.) "Absent a manifest abuse, the court's determination will not be disturbed on appeal." (*Ibid.*, citing *People v. Fudge* (1994) 7 Cal.4th 1075, 1115.) "'Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ""clearly lacks qualification as an expert."'" [Citations.]" (*People v. Panah* (2005) 35 Cal.4th 395, 478.)

Chung made no such showing here. Officer Uehara testified as to his specific training on narcotics, including sales of the three narcotics at issue here, and his experience during three years on the narcotics detail, during which he had "daily" involvement with narcotics investigation and enforcement. He also testified to his experience with vehicle-based narcotic sales. Thus, the training and experience of Officer Uehara fully supported the trial court's conclusion that he was sufficiently familiar with narcotics sales to testify on these issues. (See, e.g., *People v. Allen* (1967) 254 Cal.App.2d 597, 603-604 [admission of police officer's expert testimony where he had worked on the narcotics detail for three years and had undergone formal training].)

Chung notes that the trial court allowed a second officer, Officer Chan, to offer expert testimony, overruling defense counsel's objection that such testimony would be cumulative and stating that "I'm not certain [Officer Uehara] really can testify as to the upper level drug sale; got a lot of answers that were not quite sure regarding that." But the trial court's suggestion that Officer Uehara's testimony as to upper-level (or, potentially, mid-level) sales was more limited does not amount to a finding by the court that he lacked the qualifications to provide any expert testimony on that subject. Instead, the degree of Officer Uehara's knowledge is relevant to the weight, rather than admissibility, of the evidence. (See *People v. Allen*, *supra*, 254 Cal.App.2d at 604.)[8] Additionally, we note that Officer Chan testified to many of the same conclusions reached by Officer Uehara—including that the sale was a mid-level sale and that it would be unlikely for the seller to carry the narcotics to the buyer's vehicle (thus supporting the inference that Chung was the seller). The fact that a second officer (whose qualifications Chung does not challenge) testified to these same opinions leads us to conclude that any error in the admission of Officer Uehara's testimony was harmless. (See *People v. Spence* (2012) 212 Cal.App.4th 478, 509 [applying *Watson*].)

[The balance of the opinion is to be published.]

*D. Error in Imposition of Consecutive Sentences*

In her supplemental opening brief, Chung claims the trial court erred in imposing consecutive sentences for her convictions on counts four, five, and six. The trial court sentenced Chung to three consecutive sentences for her convictions on offering to sell

---

[8]    Chung's argument that the reasons Officer Uehara gave did not support his opinion similarly are insufficient to exclude his testimony, but could have been probed by her counsel during cross-examination as relevant to the weight to be given to Uehara's opinion that the hypothetical front passenger (i.e., Chung) possessed the drugs.

19

three substances—cocaine base (count four), methamphetamine (count five), and cocaine (count six). Chung contends that section 654 prohibited two of these sentences, as the conduct underlying these counts constituted a "single act" of offering to sell drugs to a single individual, Moran. We agree and therefore reverse with respect to the sentences imposed on counts five and six.

### 1. *Legal Principles*

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." This seemingly simple statute has generated decades of case law regarding the precise parameters of an "act" that triggers section 654's bar on multiple punishment. Until recently, the primary test to determine whether conduct constituted an "act" for the purposes of section 654 was set forth in *Neal v. State of California* (1960) 55 Cal.2d 11 (*Neal*), disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334 (*Correa*). In *Neal*, the California Supreme Court held that an "act" for the purposes of section 654 was not limited to a "single physical act," but could include a "course of conduct." (*Neal*, *supra*, 55 Cal.2d at p.19.) The test of "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Ibid*.) While *Neal's* "intent and objective" test and reasoning has been criticized and limited, its basic tenet has never been overruled. (See, e.g., *People v. Latimer* (1993) 5 Cal.4th 1203, 1205-1206 [criticizing *Neal* but declining to overrule it].)

In 2012, the California Supreme Court decided two cases altering the landscape of permissible punishment under section 654. First, in *Correa,* the court held that "[b]y its plain language section 654 does not bar multiple punishment for multiple violations of the same criminal statute." (*Correa*, *supra*, 54 Cal.4th at p. 334.) The court therefore

found that defendant's multiple sentences—imposed for convictions of seven counts of being a felon in possession of a firearm based on his possession of a "cache" of guns— did not implicate section 654 and upheld them on that basis. (*Ibid*.) The court further rejected a footnote in *Neal* suggesting (in dictum) the opposite conclusion. (*Id.* at pp. 334, 344 [rejecting dictum in *Neal*, *supra*, 55 Cal.2d at p. 18, fn. 1, that "[a]lthough section 654 does not expressly preclude double punishment when an act gives rise to more than one violation of the same Penal Code section or to multiple violations of the criminal provisions of other codes, it is settled that the basic principle it enunciates precludes double punishment in such cases also"].)

On the same day it decided *Correa*, the California Supreme Court also decided *People v. Jones* (2012) 54 Cal.4th 350 (*Jones*). In *Jones*, the defendant was convicted of three crimes arising from the same incident of having a loaded gun in his car—possession of a firearm by a felon, carrying a readily accessible concealed and unregistered firearm, and carrying a loaded unregistered firearm in public. (*Id*. at p. 352.) The Court found that all three offenses reflected a single act—the "single possession or carrying of a single firearm on a single occasion"—and held that "Section 654 prohibits multiple punishment for a single physical act that violates different provisions of law." (*Id*. at p. 358.)

In separate opinions, Justices Werdegar and Liu stated that, while they would reach the same result, they would do so under the "intent and objective test" created in *Neal*. (*Id*. at p. 361 (conc. opn. of Werdegar, J.); *id*. at p. 369 (conc. opn. of Liu, J.).) They criticized the majority opinion for failing to "persuasively explain how it has determined defendant committed only one punishable act" and thereby creating "uncertainty where none previously existed." (*Id*. at p. 361 (conc. opn. of Werdegar, J.); see also *id*. at p. 369 (conc. opn. of Liu, J.) ["reasonable minds can and often do differ on how to define the 'act' that constitutes a crime. . . . Today's opinion provides little guidance for making that determination. . . ."].) The majority responded that "[r]ather than force the court to divine what objective or objectives the defendant might have had in possessing the

21

firearm, we find it better to rely on section 654's actual language in resolving this single-act case." (*Id*. at p. 360.)

The court further noted that "[i]n some situations, physical acts might be simultaneous yet separate for purposes of section 654," citing as an example the "'simultaneous possession of different items of contraband.'" (*Id*. at p. 358 [quoting *In re Hayes* (1969) 70 Cal.2d 604, 613 (dis. opn. of Traynor, C.J.) ("the possession of one item is not essential to the possession of another separate item. . . . The possession of each separate item is therefore a separate act of possession.")].) The Court indicated it did "not intend to cast doubt on the cases so holding." (*Jones*, *supra*, 54 Cal.4th at p. 358.)

The determination whether Chung acted pursuant to a single intent and objective is a factual one, and we uphold the trial court's determination where supported by substantial evidence. (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438.)

### 2. *Counts Four, Five, and Six*

Chung contends that the sentences on counts five and six, for offering to sell methamphetamine and cocaine, respectively, impose punishment for the same underlying act as count four, offering to sell cocaine base. We are unaware of any cases (and the parties cite none) addressing this issue in the context of a single offer to sell multiple drugs to a single buyer. The parties analogize to two different lines of cases in support of their desired results.

Chung relies principally on *In re Adams* (1975) 14 Cal.3d 629 (*Adams*) in support of her argument that her offer to sell was a single act punishable only once. *Adams* involved a single incident of transportation, during which the defendant used his car to deliver multiple types of drugs to a single dealer. (*Id*. at p. 632.) The defendant was convicted and sentenced on five counts of transportation, corresponding to the different types of drugs he was carrying. (*Ibid*.) The Supreme Court found it was "unreasonable" to fragment the single objective of delivery to the dealer to reflect a different objective for transporting each drug. (*Id*. at p. 635.) "Instead, the entire transaction should reasonably be viewed as constituting an indivisible course of conduct analogous to the theft of

22

several articles of personal property which . . . results in the commission of a single punishable offense." (*Ibid.*)  On the other hand, courts have distinguished *Adams* and allowed multiple punishments where a defendant transported several types of narcotics with the intent to deliver them to multiple buyers.  (See, e.g., *People v. Blake* (1998) 68 Cal.App.4th 509, 512 [distinguishing *Adams* because the record "supports an inference that defendant intended multiple sales to different customers"].)

For its part, the Attorney General cites to a line of cases finding that simultaneous possession of multiple drugs may be punishable as separate acts, as the intent in possessing each drug may be different.  (See, e.g., *People v. Barger* (1974) 40 Cal.App.3d 662, 672 [California courts have "uniformly" held that Penal Code section 654 "does not preclude multiple punishment for simultaneous possession of various narcotic drugs"]; *People v. Monarrez* (1998) 66 Cal.App.4th 710, 714-715 (*Monarrez*) ["different drugs have different effects and pose different dangers to society"]; *People v. Schroeder* (1968) 264 Cal.App.2d 217, 227-228 [multiple punishment for simultaneous possession of various narcotic drugs not precluded by section 654].)  Thus, in *Monarrez*, for example, the defendant was convicted of possession of heroin and cocaine for sale after he was found in a family residence with the narcotics.  (*Monarrez*, *supra*, 66 Cal.App.4th at p. 712.)  The *Monarrez* court noted that "[i]t was reasonable for the court in *Adams* to find a single illegal intent where the defendant's sole act was to move a large quantity of drugs from one place to another.  Furthermore, in *Adams* the evidence showed that defendant intended to deliver all of the drugs to a single recipient."  (*Id*. at p. 714.)  The evidence in *Monarrez*, by contrast, "supported a finding that defendant had been engaged in multiple sales and intended to make multiple sales of the narcotics which he possessed."  (*Id*. at p. 715.)

Here, Chung argues her convictions based on an offer to sell multiple narcotics to a single buyer (Moran) is analogous to the single act of transportation of multiple narcotics to a

23

single buyer in *Adams*, and therefore should be subject to one punishment only.[9] The Attorney General urges us to follow the possession cases and find that Chung could have had separate objectives for each narcotic she offered to sell. Under the unique factual circumstances of this case, we agree with Chung. Significantly, many of the cases holding or approving the idea that a defendant might simultaneously possess multiple narcotics for different reasons rely, at least in part, on the fact that the defendant harbored an intent to sell to multiple people, or had the opportunity to do so. (See, e.g., *Monarrez*, *supra*, 66 Cal.App.4th at p. 714; *People v. Briones* (2008) 167 Cal.App.4th 524, 529 [convictions for possessing both heroin and methamphetamine for sale where it could be inferred that defendant intended multiple sales to different customers]; *Adams*, *supra*, 14 Cal.3d at p. 635 ["In each of the drug possession cases, the defendant's possession may or may not have been motivated by a single intent and objective, for one may possess drugs for a variety of reasons. . . . [A]lthough we do not disapprove the multiple punishment rule invoked in the drug possession cases relied upon by the People, the rule has no application to situations in which the defendant possesses the drugs for the purpose of accomplishing only a single criminal objective."].) In these instances, a defendant could simultaneously possess multiple narcotics with multiple objectives, for example, to sell some to one buyer, some to another buyer, and retain some for another purpose. But here, Chung was acquitted on all possession charges and convicted only based on evidence of a single offer to sell the narcotics to a single buyer—Moran. There is no possibility that she maintained possession with intent to sell to someone else when the jury found no possession at all. Thus, we cannot say that there was substantial

---

[9]     Alternatively, Chung contends that her offer to sell was a single act covered under *Jones*, thus requiring no inquiry into her intent or objective(s). We do not believe the question whether Chung committed a single act is as easily disposed of as the circumstances in *Jones* (particularly given the *Jones* court's approval of cases finding separate acts of possession for multiple items of contraband (*Jones*, *supra*, 54 Cal.4th at p. 358)), and therefore find the application of *Neal's* "intent and objective" test to remain instructive for our circumstances.

24

evidence in the record of multiple objectives underlying Chung's single act of offering to sell multiple narcotics to a single buyer.[10]

Further, an additional rationale underlying the allowance of multiple punishments—that such punishment is appropriate where a single act is punishable under multiple statutes directed at distinct evils— cannot survive *Jones*. In *Jones*, the Supreme Court expressly rejected this rationale, noting that the plain language of section 654 is precisely aimed at conduct punishable under more than one statute. (*Jones*, *supra*, 54 Cal.4th at 358.) Thus, whether the Legislature intended to regulate or punish the possession or sale of different narcotics separately has no bearing on whether the conduct at issue is a single act triggering the application of section 654.

Finally, we note that counts four and six charge violations of the same statute, Health and Safety Code section 11352. This could potentially implicate the holding in *Correa* that section 654 does not apply to bar "multiple punishment for violations of the *same provision of law*." (*Correa*, *supra*, 54 Cal.4th at p. 340.)[11] However, in *Adams*, two of the counts alleging transportation of two different narcotics (seconal and benzedrine) charged violations of the same statute (Health & Saf. Code section 11379); similarly, the

---

[10]    In briefing and at oral argument, the Attorney General pointed to the underlying purpose of section 654 "to ensure that punishment is commensurate with culpability," which has led some courts to deny its application, reasoning that "[i]t would be absurd to hold that a criminal who deals in one contraband substance can expand the scope of his inventory without facing additional consequences." (*Monarrez*, *supra*, 66 Cal.App.4th at pp. 714-715 [quoting *People v. Menius* (1994) 25 Cal.App.4th 1290, 1297].) While we reach a different result under the facts here, we note that, as in *Monarrez*, in most instances where a defendant "expands the scope of his inventory" by possessing and/or selling multiple kinds of narcotics, the evidence would likely support "a finding that defendant had been engaged in multiple sales and intended to make multiple sales of the narcotics which he possessed," thus rendering section 654 inapplicable. (*Id*. at p. 715.)

[11]    In discussing the scope of section 654, *Correa* appears to use the terms "statute" and "provision" interchangeably. (See, e.g., *id*. at p. 337 ["This case involves multiple violations of the *same* statute, while the express language of section 654 applies to an act that is punishable in *different* ways by *different* provisions of law."] (Emphases in original).)

two counts charging transportation of heroin and pantopon alleged violation of a single statute (Health & Saf. Code section 11352). Although the statutes (sections 11379 and 11352) were the same, the court noted that these counts were punishable under separate provisions of the Health & Safety Code and therefore squarely covered by section 654's prohibition of "multiple punishment of an act or omission 'made punishable in different ways by different provisions of this Code.'" (*Adams, supra*, 14 Cal.3d at p. 636.) The *Adams* holding remains undisturbed by *Correa* and we follow it as applicable to the facts here. Ultimately, the court's focus in *Correa* on the plain language of section 654 reflects an intent to exclude from that section's reach only conduct punishable more than once under a single *provision*, a result consistent with *Adams* and inapplicable to this case.

Accordingly, under the particular facts presented here, we conclude that section 654 bars multiple punishments on Chung's convictions under counts four, five, and six. We therefore reverse as to that issue.

26

## DISPOSITION

The judgment is reversed insofar as it imposes and executes consecutive sentences on counts five and six. The case is remanded to the trial court to stay the sentences on those counts consistent with this opinion. The judgment is otherwise affirmed. The clerk of the superior court is instructed to prepare an amended abstract of judgment reflecting these changes and serve a copy on the Department of Corrections and Rehabilitation.

**CERTIFIED FOR PARTIAL PUBLICATION**


COLLINS, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

27